[L.A. No. 31675. May 19, 1983.]

JOHN A. McCONNELL et al., Plaintiffs and Appellants, v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,
Defendant and Respondent.

## COUNSEL

Roger J. Aull, Marcus Crahan, Jr., and Jack D. Scott for Plaintiffs and Appellants.

Macdonald, Halsted & Laybourne, Orville A. Armstrong and Joel Mark for Defendant and Respondent.

## OPINION

**MOSK, J.**—Section 2 of the Usury Law provides in part that "interest shall not be compounded . . . unless an agreement to that effect is clearly expressed in

writing and signed by the party to be charged therewith."[1] The issue in this case is whether, in an action alleging violation of the section, parol testimony of the borrower, and written communications sent by the lender to the borrower, may be utilized to explain the meaning of a written agreement that does not, on its face, clearly provide for compounding. We conclude that the language of section 2, the purposes of the Usury Law, and our decision in *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51], compel the conclusion that such evidence may not be used to explain the meaning of an agreement that is not unequivocal on its face.

Plaintiffs entered into a written "customer's agreement" with defendant brokerage firm for the purchase of securities on margin. The agreement provided for payment of interest on sums advanced by defendant for that purpose. It described plaintiffs' obligation to pay interest as follows: "The monthly debit balance in my account(s) shall be charged, *in accordance with your usual custom* with interest at a rate which shall include the average rate paid by you on your general loans during the period covered by such balances respectively, and any extra rates caused by market stringency, together with a charge to cover your credit service and facilities." (Italics added.) Defendant compounded interest monthly, adding interest owing at the end of each month to the debit balance of the account; the balance bore interest in the following month.

Plaintiffs filed suit individually and on behalf of a class of customers in California who maintained margin accounts with defendant between November 26, 1971, and September 26, 1973. The first and second causes of action alleged that defendant had compounded interest in violation of section 2 which, as we have seen, prohibits compounding "unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith."

In a prior appeal in this action (hereinafter referred to as *McConnell I*), we held that the term "usual custom" in the customer's agreement "on its face does not clearly express an understanding that interest would be compounded." (*McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1978) 21 Cal.3d 365, 375 [146 Cal.Rptr. 371, 578 P.2d 1375].) The trial court had held to the contrary, and we reversed its judgment.[2] However, since this court, like the

---

[1] The section also provides: "Any agreement or contract of any nature in conflict with the provisions of this section shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." (Deering's Ann. Uncod. Measures 1919-1, § 2 (1973 ed.) p. 40; 10 West's Ann. Civ. Code (1954 ed.) foll. § 1916, p. 137.)

[2] Additional causes of action in the complaint alleged that defendant charged interest in excess of 10 percent in violation of former article XX, section 22, of the California Constitution. Our

trial court, was concerned only with whether the agreement complied with section 2 on its face, we did not discuss whether the causes of action alleging violation of that provision could proceed as a class action, nor did we express an opinion whether extrinsic evidence could be introduced to explain the meaning of the term "usual custom" in the customer's agreement.[3]

Following remand of the case to the trial court, the matter was assigned to Judge Campbell M. Lucas, who made certain preliminary determinations with regard to the action. He certified the action as a class action, defined the composition of the class, and ordered that notices of pendency of the action be sent to potential class members. Pursuant to this direction, approximately 52,000 customers of defendant were sent notices.

Plaintiffs moved to have the issues of damages and liability bifurcated, and sought an order declaring certain issues to be without controversy. Judge Lucas granted both motions, and found that the following issues were without substantial conflict: that defendant charged class members compound interest; that the only form of written agreement executed by class members with defendant was either of two forms of the customer's agreement; that neither form of that agreement is on its face and as a matter of law sufficiently clear to comply with section 2; that defendant was the agent and fiduciary of the class members; that as fiduciary it was required to exercise the highest good faith toward them, to make full disclosure of all material facts, and to refrain from taking advantage of them by misrepresentation or concealment, and that it owed class members the duty to disclose that it would charge compound interest before such charges were imposed.

Thereafter, the matter was assigned to Judge Peter S. Smith for trial. Although the record is not clear, Judge Smith apparently determined that the propriety of proceeding with the action as a class action would be tried first. Over plaintiffs' objections, the court then received testimony from various of defendant's customers regarding whether they were aware that it was defendant's "usual custom" to charge compound interest on margin accounts.

In an attempt to demonstrate that its customers were aware that they were being charged compound interest, defendant introduced into evidence samples of monthly statements of account furnished to its customers. A customer who examined these statements could ascertain therefrom that unpaid interest was debited each month against the balance in the account and interest was charged

---

opinion in *McConnell I* discussed these additional counts at length. On remand, the trial court dismissed the excess interest causes of action. The present appeal does not involve that ruling.

[3]As we shall discuss *post,* the parties and the trial court misconstrued the language of our opinion in *McConnell I* on the question of admissibility of extrinsic evidence.

on that balance—i.e., interest was compounded. Defendant also introduced into evidence a booklet entitled "What is Margin?" that had been sent to an undetermined number of its customers; it contained an example of a monthly account statement, and a letter entitled "To Our Customers." While these documents did not state that interest on margin accounts was compounded, defendant claims they implied that this was the case, and thus customers were provided notice that they were charged compound interest.

Defendant called as witnesses two certified public accountants, an investment advisor, and a lawyer, who testified that they were aware compound interest would be charged on debit balances in their margin accounts because of their experience with such accounts with other brokers before they signed defendant's customer's agreement, or that they became aware such charges were made after they opened their margin accounts, from the monthly statements they received.

Two of the named plaintiffs, John McConnell and Carolina Barrie, testified that they did not know when they opened their accounts that interest would be compounded. However, Mrs. Barrie testified that after she learned, following the filing of the present action, that defendant was charging interest on that basis, she examined her monthly statements of account and could determine therefrom that defendant had been compounding interest on the debit balances.

In rebuttal, plaintiffs introduced the testimony of four customers who stated that they did not realize they were charged compound interest until they received notice of the pendency of the class action, or thereafter. When defense counsel on cross-examination reviewed their statements of account with some of these witnesses, they admitted that it could be ascertained from those statements that defendant was compounding interest, but they testified that they did not read the statement with that in mind when they received it, or that they had "never really given . . . any thought" to the question of compounding.

After receiving this evidence, Judge Smith ordered that the class be decertified "because individual issues dominate over class issues." No findings of fact or conclusions of law were requested by the parties. Nevertheless, it is clear from the court's remarks, and not disputed by the parties, that the order of decertification was based on the court's view that in order to decide whether defendant had violated section 2 it would be necessary to receive the testimony of each class member to determine whether and to what extent each was aware of defendant's "usual custom" of compounding interest. Following the order of decertification, the court dismissed the proceeding as a class action. This appeal ensued.

Plaintiffs' major contention on appeal is that the testimony of each class member as to whether he understood that compound interest would be charged by defendant is irrelevant to a cause of action for violation of section 2 because that provision requires that the agreement to pay compound interest be embodied in a writing clear on its face and signed by the borrower.

We first discuss our decision in *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d 442, which was filed nine months after *McConnell I.* In *Fletcher,* the plaintiff alleged on behalf of himself and a class of similarly situated borrowers that the defendant's practice of quoting interest calculated on the basis of a 360-day year as a "per annum" rate in a lending agreement was a breach of contract and a violation of section 17500 of the Business and Professions Code. That section, a provision of the Unfair Practices Act, prohibits any person or corporation from making untrue or misleading statements concerning services it offers in order to induce the public to enter into an obligation relating to such services.

The trial court held that prior knowledge of a borrower as to the meaning of the term "per annum" would preclude him from recovering for breach of contract, and that some of the 50,000 class members had such knowledge. It concluded that since there was no ready method to determine the number and identity of the members of the purported class who knew the meaning of the term without examining each of them individually, the action could not be maintained as a class action because the individual issue of knowledge predominated over common questions. We affirmed the trial court's determination in this regard.

However, we confined our approval of the ruling to the cause of action for breach of contract. In regard to the cause of action alleging unfair trade practices in violation of section 17500 of the Business and Professions Code, we held that the fact that some borrowers knew the meaning of the term " per annum" was not an obstacle to certification of the action as a class action. We reasoned as follows: Section 17535 of the Business and Professions Code[4] vests the trial court with broad authority to fashion a remedy that will prevent unfair trade practices and will deter the defendant and others from engaging in such practices in the future. The provision of the section for restitution of property acquired by means of illegal practices provides such deterrence. Allowing a

---

[4]Section 17535 provides in part, "Any person, corporation, [or] firm . . . which violates . . . this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders . . . as may be necessary to prevent the use or employment . . . of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

class action to proceed in the absence of individualized proof of lack of knowledge of the fraud is an effective method of accomplishing the disgorgement of property obtained by illegal means. Finally, the basic equitable principles that underlie section 17535 arm the trial court with broad powers to accomplish justice among the parties.

Not surprisingly, plaintiffs emphasize the holding in *Fletcher* that proof of the knowledge of individual class members regarding the meaning of the terms used in a lending agreement is not necessary for the prosecution of a class action for violation of a statute designed to prevent unfair trade practices. Conversely, defendant relies on the holding in the first part of *Fletcher* that the trial court did not err in refusing to allow the contract claim to proceed as a class action because individual proof of knowledge as to the meaning of the terms used in the agreement was required in order to establish such a claim.

In our view, the principles stated in *Fletcher,* as well as the language and purposes of section 2, require us to hold in favor of plaintiffs. The complaint in the present case does not allege a cause of action for breach of contract. Both the first and second causes of action allege violation by defendant of section 2; plaintiffs do not pray for damages for breach of contract, but seek, rather, the penalties set forth in the Usury Law for violation of its terms.[5] Thus, our holding in *Fletcher* regarding the cause of action for breach of contract is inapposite to the present action.

*Fletcher* involved allegations that defendant had violated laws designed to prevent unfair trade practices and the present case alleges violation of the Usury Law, but the underlying principles of that case are applicable. Section 2 is designed to protect borrowers, prevent the unjust enrichment of lenders, and deter lenders from violating its terms. It achieves the first of these goals by providing that a lender who intends to charge compound interest must express that intention in clear terms and, in order to assure that the language employed by the lender meets this requirement and that the borrower agrees to pay compound interest, it prescribes that the provision for compounding must be in writing and signed by the borrower. The second and third goals of the section are evident from the provision therein that an agreement which does not comply with its requirements shall be "null and void" with regard to the promise to pay interest.

■ If we were to hold that a lending agreement unclear on its face as to whether compound interest would be charged could be explained by parol evidence of some borrowers' understanding, we would be doing violence not

---

[5]The first cause of action prays for recovery of the interest charges paid by plaintiffs, as provided in section 2, while the second seeks treble damages under section 3 of the Usury Law.

only to the express terms of the section, but also to its objectives. The section was designed to prevent the uncertainty inherent in the evaluation of such evidence. Thus, testimony should not have been received that some of defendant's customers understood that they would be charged compound interest either because they could discern from the statements of account they received from defendant that it was charging such interest each month, or because of their experience with the charges made by other brokerage houses, while other customers were not aware that compound interest was being charged until the present action was filed. Such evidence is not relevant to the issue presented by the complaint, i.e., whether defendant violated section 2 by failing to clearly express in a writing signed by its customers that compound interest would be charged on money borrowed on their margin accounts.

Nor is defendant's position enhanced by the fact that it sent to its customers various documents which assertedly provided notice to them that compound interest was being charged on their accounts. Even if we were to concur with the dubious proposition that these documents clearly provided notice that defendant was charging compound interest on the accounts, their receipt would not satisfy the unequivocal requirement of section 2 that the borrower must agree in writing to pay compound interest. As we have seen, the trial court determined that the only agreement signed by class members was the customer agreement. The court therefore erred in admitting the testimony of defendant's customers regarding their understanding of the meaning of the term "usual custom," and the documents relied on by defendant as providing notice to its customers do not satisfy the precise requirements of section 2.

This conclusion not only safeguards the interests of the borrower, which is an important objective of section 2, but it also furthers the remedial purposes of the section. The protection of unwary borrowers against usury is at least as urgent a societal concern as safeguarding them against the unfair trade practices alleged in *Fletcher*. If each borrower's understanding of the language used in a lending agreement were admissible as an aid to "interpreting" its meaning, a cause of action for violation of the section would often be rendered inappropriate for prosecution as a class action. The result would be that lenders who violated section 2 would be shielded from liability to a very substantial number of borrowers whose only practical recourse to recover for violation of the section would be their participation in a class action. As we said in *Fletcher*, "[w]e do not deter indulgence in fraudulent practices if we permit wrongdoers to retain the considerable benefits of their unlawful conduct." (23 Cal.3d at p. 451.)

Defendant relies on language in our *McConnell I* opinion assertedly establishing the principle that extrinsic evidence is admissible to determine whether the parties intended by the language of the customer's agreement to permit

the compounding of interest, and that if such an intention is shown, the agreement complies with the requirements of section 2. In footnote 5 of our opinion (21 Cal.3d at p. 374), we distinguished a case cited by plaintiffs (*Robertson v. Dodson* (1942) 54 Cal.App.3d 661 [129 P.2d 726]) in which the Court of Appeal had held that section 2 requires a clear expression in writing that interest will be compounded, and that the court would not imply an agreement to pay such interest even though it was the lender's custom to charge interest on that basis. The court reasoned that while custom may be used to interpret a contract, it cannot be used to create one. We distinguished the customer's agreement signed by plaintiffs here on the ground that it expressly referred to defendant's "usual custom," and hence that evidence of custom in the present case would not serve to create a new contract but to interpret the written agreement. We then stated, "Plaintiffs do not contend that section 2 of the Usury Law bars admission of extrinsic evidence at trial to show that contractual language clearly expressed the parties' intention to permit compounding of interest."

In *McConnell I,* because the trial court had made its determination that the customer's agreement complied with section 2 solely on the basis of the face of the agreement, the question of admissibility of extrinsic evidence to explain the term "usual custom" was not involved in the appeal. Footnote 5 does not state and was not intended to be an affirmative expression of opinion that extrinsic evidence is admissible to show that a contract complies with section 2;[6] the purpose of the language quoted and other statements in the opinion was simply to declare that the question of extrinsic evidence was not involved in the appeal in *McConnell I.*

The only remaining contention that requires discussion is plaintiffs' claim that the court erred in decertifying the action as a class action because there were no changed circumstances justifying decertification. (*Green v. Obledo* (1981) 29 Cal.3d 126, 148 [172 Cal.Rptr. 206, 624 P.2d 256].) But plaintiffs did not request findings of fact or conclusions of law; therefore, we cannot determine whether or not Judge Smith made a determination of a change in circumstances following the initial certification of the class by Judge Lucas.[7]

---

[6] Plaintiffs appear also to have been confused by our language in footnote 5. Although at some points in the proceedings they conceded "in all candor" that the footnote meant parol evidence could be received on the question of custom, at other stages they took a contrary position.

[7] The trial court denied plaintiffs' request to add an additional class representative—a ruling that plaintiffs challenge. The purpose of the request was to assure a sufficient number of representative plaintiffs in the event the trial court held that John McConnell was not a proper representative of the class because his testimony indicated that he had knowledge that defendant was compounding interest on his margin account. In view of our conclusion that such testimony was inadmissible, it is not necessary to address this claim.

The order is reversed.

Bird, C. J., Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

The petitions of all parties for a rehearing were denied June 22, 1983.